# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * * * * * * * *
GREGORY ORDUNO, *
*
Petitioner, *
*
v. *
*
SECRETARY OF HEALTH *
AND HUMAN SERVICES, *
*
Respondent. *
* * * * * * * * * * * * * * * * * * * * * * * * * *

No. 21-1964V
Special Master Christian J. Moran

Filed: October 13, 2026

Jonathan J. Svitak, Shannon Law Group, Mr. Orduno.C., Woodbridge, IL, for petitioner;
James V. Lopez, United States Dep't of Justice, Washington, DC, for respondent.

**DECISION DENYING ENTITLEMENT TO COMPENSATION**[1]

Gregory Orduno received a tetanus-diphtheria-acellular pertussis ("Tdap") vaccine on April 1, 2020. He developed various problems, which, according to some medical professionals, were manifestations of a neurologic disorder, Guillain-Barré syndrome ("GBS"). Mr. Orduno alleges that the Tdap vaccine caused him to suffer GBS and he seeks compensation through the National Childhood Vaccine Injury Compensation Program. Mr. Orduno relies upon reports from one neurologist he retained in the litigation, A.H.M. Mahbubul Huq. Mr. Orduno also argues his case through one brief.

To address the opinions for Dr. Huq, the Secretary presents reports from a neurologist, Peter D. Donofrio, and an immunologist, You-Wen He. Like Mr. Orduno, the Secretary advocates in one brief. There, the Secretary contends that Mr. Orduno is not entitled to compensation for three reasons. First, the Secretary questions whether Mr. Orduno suffered from GBS. Second, the Secretary disputes that the Tdap vaccine can cause GBS. Third, the

[1] Because this decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

Secretary argues that Mr. Orduno did not suffer from a neurologic problem for longer than six months.

This third argument from the Secretary is meritorious—Mr. Orduno has not established with preponderant evidence that his neurologic condition lasted more than six months. Because the severity requirement is an independent statutory obligation, the other questions regarding diagnosis and causation are not reached.

## I. Background: Events in Mr. Orduno's Medical History and Events in Litigation

### A. Vaccination and Ensuing Six Months

Mr. Orduno was born in 1971. In early 2020, he owned a construction company, Creative Fence Co. Exhibit 9 (damages affidavit).

On April 1, 2020, while working at a job, he punctured his hand. Exhibit 2 at 32. He sought care at Tenet Health Central Coast Sierra Vista Regional Medical Center, where his hand was sutured. He also received a dose of the Tdap vaccine. Id. The sutures were removed about a week later. Id. at 17-19.

On April 25, 2020, Mr. Orduno presented to French Hospital in San Luis Obispo, California with complaints of bilateral leg pain, hip pain and shoulder pain. See Exhibit 7 at 17. Mr. Orduno reported that these symptoms started about one week prior. Id. An affidavit also recounts that some problems began around April 18, 2020. Exhibit 9 ¶ 7. Mr. Orduno's neurological examination was normal. Exhibit 5 at 17. The French Hospital physician believed Mr. Orduno to have an underlying rheumatological disorder and deferred labs due to a concern about the cost. Id. at 19. Mr. Orduno was discharged and directed to follow up with his primary care physician. Id.

A few days later, petitioner returned to his primary care physician, Katya Serrano, M.D., complaining of worsening numbness and pain in his bilateral hands and feet. Exhibit 5 at 36-39 (Apr. 28, 2020). He reported having poor balance, decreased grip strength, right-sided facial numbness, and facial droop. Id. On exam, Mr. Orduno was unable to wrinkle his forehead, smile, show teeth, puff check outward, or close his right eye. Id. He had decreased sensation with bilateral paresthesias in his hands and feet, in stocking-glove distribution. Id. He had 1+ reflexes in his upper and lower extremities. Id. After consulting with a neurologist, Dr. Serrano referred Mr. Orduno to the ED for further evaluation due to "[c]oncern for GBS." Id.

Consistent with the advice of Dr. Serrano, Mr. Orduno went to the Cottage Health Emergency Department in Goleta, California. See Exhibit 4 at 2. Mr. Orduno reported that he woke up 10 days earlier with pain in the back of both of his legs. Id. Since that day, the pain has spread to his neck. A neurological examination revealed a right sided facial droop and diminished patellar reflexes bilaterally. Id. at 3. Mr. Orduno underwent a "lumbar puncture procedure to check for Guillain-Barré" Syndrome. Id. at 10. The lumbar puncture revealed "albuminocytological dissociation consistent with acute inflammatory demyelinating polyneuropathy" (AIDP) as well as elevated "total protein" levels at a value of 63 mg/dL. Id. at 18, 40. An expanded metabolic panel revealed elevated "total protein" levels of 8.3 g/dL, elevated Globulin levels of 4.7 g/dL, low levels of Albumin/Globulin Ratio of 0.8 g/dL and

elevated levels of Total Bilirubin of 1.4 mg/dL. Id. at 48. Id. Mr. Orduno also reported "numbness and tingling" in his fingers and toes. Id. He also reported developing a right facial droop. Id. He denied any fever. Id. He underwent MRI of the brain and lumbar spine (Indications: "bilateral weakness" Id. at 15), which revealed a disc bulge at L4-5 and L5-S1. Id. at 12.

A neurologist, Dela Amoussou, reviewed Mr. Orduno's MRI and lumbar puncture results. Exhibit 4 at 12. Dr. Amoussou noted that Mr. Orduno's history included receipt of the tetanus shot one month prior. Id. A physical examination noted symmetric deep tendon reflexes at 2+/4 throughout and trace in his bilateral ankles. Id. at 14. Dr. Amoussou's assessment included "bilateral facial weakness" with "absent ankle reflexes." Id. at 17. His diagnosis was acute inflammatory demyelinating polyneuropathy ("AIDP") based upon Mr. Orduno's cerebral spinal fluid results, specifically evidence of albuminocytological dissociation. Id. at 17-18. Mr. Orduno was recommended for a five-day course of IVIG treatment. Id. at 18.

Mr. Orduno remained in the hospital until May 3, 2020. During this hospitalization, Dr. Amoussou suspected that Mr. Orduno's GBS was "likely a[] reaction to [his] tetanus shot." Exhibit 8 at 41. At discharge, he was referred to physical, occupational, and speech therapy. Id. at 25-27. According to the Secretary, "there is no record of petitioner attending any of this recommended therapy." Resp't's Br., filed May 30, 2025, at 4.

About a week after discharge, Mr. Orduno saw his primary care physician, Dr. Serrano. He continued to complain of fatigue and constipation, which may be related to the Gabapentin prescribed upon his discharge from the emergency room. Exhibit 7 at 32. Dr. Serrano assessed Mr. Orduno with "Guillain-Barré Syndrome following vaccination" (with ICD-10-CM Code T88.1XXA). Id. at 34.

On June 19, 2020, approximately two and a half months after vaccination, Mr. Orduno followed up with Dr. Serrano regarding GBS. Exhibit 7 at 29-31. He reported "feeling much better," with "95% resolved" tingling in his hand and "near normal" grip strength. Id. He was then lifting fifteen-pound weights, increased from five pounds, to regain arm strength. Id. His right-sided facial droop was "improved," but he "[s]till ha[d] mild facial droop" and was unable to completely close his right eye. Id. Mr. Orduno reported he was working with a vaccine lawyer and "[did not] think he will ever get a vaccine again." Id. The assessment was GBS with "ongoing improvement of [symptoms]." Id.

### B. Medical Records from 2021

Following the June 19, 2020 appointment with Dr. Serrano, Mr. Orduno next saw a doctor on January 30, 2021, over seven months later. Exhibit 5 at 66-69. Mr. Orduno presented to the ED at French Hospital Medical Center, complaining of dizziness, lightheadedness, chest pain, and weakness that started after a "pretty heavy party weekend" around New Year's that included alcohol and marijuana use. Id. at 66. The EKG and neurological exam were normal. Id. at 67-69. Mr. Orduno was discharged with a diagnosis of atypical chest pain. Id. at 69.

In 2021, Mr. Orduno saw doctors for complaints such as chest pain with intermittent dizziness. Details can be found in Resp't's Br. at 5. The important detail is that none of the doctors linked any symptoms from 2021 to his neurologic problem in April 2020.

### C. Start of Litigation

Mr. Orduno started this litigation by filing his petition on October 5, 2021. For about a year, Mr. Orduno filed medical records. See Mr. Orduno's Statement of Completion, filed Sep. 19, 2022.

The Secretary reviewed this material and recommended against an award of compensation. Resp't's Rep., filed Jan. 30, 2023. The Secretary contended that Mr. Orduno did not meet the severity requirement. Id. at 6. The Secretary also noted that Mr. Orduno had not provided a report from a retained expert. Id. at 8.

In anticipation of the parties submitting reports from experts, a set of instructions was proposed. Order, issued Feb. 14, 2023. The instructions directed the experts to discuss diagnosis and the three Althen prongs, but did not address severity. After the parties did not object, the proposed instructions became final. Mr. Orduno was directed to file a report from an expert. Order, issued Feb. 14, 2023 (setting deadline of May 15, 2023).

### D. Medical Appointment in 2023

A medical record that does discuss Mr. Orduno's history of GBS and current problems was created on October 4, 2023 by a neurologist, Grant De La Motte, M.D. Exhibit 12 at 3-20. Mr. Orduno provided a history of being admitted to the hospital "with GBS a couple years ago." Id. at 3. He said, "he made a slow recovery" from GBS, but that "some symptoms over time seemed to have returned." Id. He described constant numbness in his hands and feet, with variable severity, which was worse when he was tired after a busy day. Id. at 3-4. The report of numbness is consistent with an affidavit prepared for this litigation. See Exhibit 9 ¶ 12 ("my health is relatively back to normal, but I do still experience numbness in my hands and feet").

Dr. La Motte performed a neurological exam, which was unremarkable except for a "[m]ild sensory abnormality over the left lateral femoral cutaneous nerve." Exhibit 12 at 5. Mr. Orduno had a normal motor function, normal coordination, normal gait, and all his reflexes were intact. Id. at 4-5. Dr. De La Motte noted Mr. Orduno's "facial sensation [was] intact bilaterally to light touch" and his "facial expression [was] full and symmetric." Id. at 4. Also, Mr. Orduno's sensation was "intact over the hands and feet to all modalities." Id. at 5. Dr. De La Motte diagnosed Mr. Orduno with a lateral femoral cutaneous neuropathy and a sensory polyneuropathy and prescribed Gabapentin. Id. at 5, 14. Dr. De La Motte "offered [an] EMG to further define degree of axon loss and rule out alternative treatable diagnosis, [for example] carpal tunnel syndrome." Id. at 5. Mr. Orduno declined this EMG recommendation. Id. Dr. La Motte's medical record is the most recent medical record that the parties discuss in their briefs. See Pet'r's Br. at 6; Resp't's Br. at 6.

### E. Development of Remaining Reports from Experts

After receiving some enlargements of time, Mr. Orduno submitted Dr. Huq's first report on Nov. 18, 2023. Exhibit 10. With respect to the duration of any medical condition, Dr. Huq wrote one paragraph. He stated: "Three years after the diagnosis [of] GBS, [Mr. Orduno] continues to experience numbness in his hands and feet. He is also limited in his daily activities and cannot perform many of the non-work activities that he enjoyed before the vaccination." Id. at 5. The only evidence Dr. Huq cited for this assertion was Mr. Orduno's damages affidavit, which is Exhibit 9. Dr. Huq did not refer to the appointment with Dr. La Motte. Presumably, Dr. Huq omitted this appointment because Mr. Orduno had not yet obtained medical records from Dr. La Motte.

As noted previously, the Secretary obtained reports from two people. As to the question of severity, Dr. He's reports are largely not relevant as Dr. He mostly addressed causation. See Exhibit A. On the other hand, Dr. Donofrio's report does address severity. In Dr. Donofrio's first report, he stated "It is important to comment that the petitioner made a remarkable recovery from his illness. By June 19, 2020, two months after the onset of his symptoms, he stated he was much better and the numbness was 95% better." Exhibit C at 6-7, citing Exhibit 3 at 6-8.

Dr. Huq responded to both Dr. He and Dr. Donofrio. But, again, the response regarding Dr. Donofrio is more relevant to the basis for this decision. Dr. Huq does not really engage with the question of severity. At best, Dr. Huq wrote: "G.O. had constipation which could be due to autonomic dysfunction after GBS. After TdaP vaccination, G.O. had intermittent symptoms of dizziness, headache and chest pain which could have been due to autonomic dysfunction after GBS, but that possibility was not explored." Exhibit 11 at 2. Dr. Donofrio did not return to this topic in his second report. See Exhibit E.

### F. Briefing

Dr. Donofrio's second report closed the phase of expert development. See Order, issued Sep. 12, 2024. The parties advocated through briefs. Pet'r's Br., filed Mar. 7, 2025; Resp't's Br., filed May 30, 2025. Mr. Orduno did not file a reply, leaving several arguments unrebutted. The case is ready for adjudication.

## II. Standards for Adjudication

A petitioner is required to establish his case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of

Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## III. Elements for Entitlement

To receive compensation, petitioners must establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E); 42 U.S.C. § 300aa–13(a)(1)(A) (authorizing special masters to award compensation when petitioners establish items listed in section 11(c)(1)). The fourth element concerns the severity of injury.[2] Petitioners may meet this element by establishing that their injury lasted more than six months. The failure to establish six months of injury results in a denial of compensation. See Starvridis v. Sec'y of Health & Hum. Servs., No. 07–261V, 2009 WL 3837479, at *4 (Fed. Cl. Spec. Mstr. Oct. 29, 2009); Song v. Sec'y of Health & Hum. Servs., No. 92-279V, 1993 WL 534746 (Fed. Cl. Spec. Mstr. Dec. 15, 1993), mot. for rev. denied, 31 Fed. Cl. 61 (1994), aff'd, 41 F.3d 1520 (Fed. Cir. 1994) (table).

## IV. Analysis

Here, a valuable record is Dr. Serrano's June 19, 2020 medical record. Mr. Orduno informed Dr. Serrano that he was "feeling much better," with "95% resolved" tingling in his hand. Exhibit 7 at 29-31. June 19, 2020 is approximately two and a half months after the April 1, 2020 Tdap vaccination. Thus, any residual problems would need to last approximately three and a half more months.

But, no medical records were created for the remainder of 2020. See Pet'r's Br. Thus, it is easy to infer that the reason Mr. Orduno did not seek medical attention was that he continued to feel much better and any tingling resolved. The Secretary's argument is persuasive.

To counter the Secretary's argument, Mr. Orduno essentially points to two pieces of evidence. The first is Mr. Orduno's affidavit and the second is the October 2023 appointment with Dr. La Motte. Pet'r's Br. at 30-31.

Although both the affidavit and Dr. La Motte's medical record are evidence and, therefore, must be considered, neither the affidavit nor the medical record carry much weight. The same infirmity minimizes their value—both were created during litigation. In opposing Mr. Orduno's argument that his condition lasted longer than six months, the Secretary raised the circumstances in which this evidence was created. The Secretary argued "'[j]udicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory.'" Resp't's Br. at 31, quoting Duda v. Sec'y of Health & Hum. Servs., No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021). Some rejoinder to this argument might have been expected, but Mr. Orduno did not file a reply.

---

[2] To be clear, the Secretary also contends that Mr. Orduno did not meet the third element, which is causation, for two reasons (lack of proof of diagnosis and lack of proof for causation). However, these issues are not reached.

Moreover, while Dr. La Motte dutifully recorded the history that Mr. Orduno provided to him, Dr. La Motte's neurologic examination revealed normal motor function, normal coordination, normal gait, and all Mr. Orduno's reflexes were intact. Exhibit 12 at 4-5. These normal results are consistent with a recovery from Guillain-Barre syndrome and merit more consideration than the subjective history reported by Mr. Orduno.[3]

Accordingly, for these reasons, Mr. Orduno has not established that the neurologic condition that started in April 2020 lasted for more than six months. Therefore, he is not entitled to compensation.

As just reviewed, the decision in Mr. Orduno's case is based upon the evidence presented. However, the result—a finding that Mr. Orduno did not suffer a neurological problem for more than six months—is similar to results reached in other cases. See, e.g., Weiss v. Sec'y of Health & Hum. Servs., 177 Fed. Cl. 238 (2025) (denying motion for review of a decision in which the special master found the petitioner did not meet the six-month rule); Oreja Colon v. Sec'y of Health & Hum. Servs., 156 Fed. Cl. 534 (2021) (same); Wyatt v. Sec'y of Health & Hum. Servs., 144 Fed. Cl. 531 (2019) (same), aff'd, 825 Fed.Appx. 880 (Fed. Cir. 2020); Hospedales v. Sec'y of Health & Hum. Servs., No. 19-1588V, 2026 WL 1556072, at *11-13 (Fed. Cl. Spec. Mstr. May 6, 2026). While none of those cases are binding precedents, the reasoning is persuasive.

## V. Conclusion

Mr. Orduno may have a sound basis for believing that the Tdap vaccination harmed him. But, even if causation were found (and that question is not reached), the Vaccine Act also requires any injury to be severe. Fortunately for Mr. Orduno's health, he recovered quickly enough that any injury did not last for more than six months. Thus, he is not entitled to compensation.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

IT IS SO ORDERED.

s/Christian J. Moran
Christian J. Moran
Special Master

[3] Although Dr. La Motte detected an abnormality in Mr. Orduno's left lateral femoral cutaneous nerve, Dr. La Motte did not say that this problem was a sequella to the condition Mr. Orduno experienced in April 2020. See Resp't's Br. at 30 n.2.